**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| Cynthia Saffo and Tina Ingram, on behalf of herself and her minor child, H.I., as individuals and on behalf of all others similarly situated, | CASE NO.: 2:22-cv-00997 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | DEMAND FOR JURY TRIAL |
| OneTouchPoint, Inc., | |
| Defendant. | |

Plaintiffs Cynthia Saffo and Tina Ingram, on behalf of herself and her minor child, H.I. ("Plaintiffs"), bring this Class Action Complaint as individuals and on behalf of all other individuals who are similarly situated ("Class") against OneTouchPoint, Inc. ("Defendant" or "OTP"), and allege, upon personal knowledge as to their own actions and their counsels' investigations, and upon information and belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1.      OneTouchPoint, Inc. is software and business services company that provides a multitude of services for businesses as a one stop shop. They offer "end to end" services or otherwise known as start to finish services divided into five categories: marketing, managing, producing, distributing, and analyzing.[1] More specifically, OTP works as a third-party mailing and printing vendor for healthcare providers and health insurance carriers.[2]

2.      On or about July 27, 2022, OTP began notifying consumers and state Attorneys General about a data breach that it discovered on or about April 28, 2022 (the "Data Breach").[3]

---

[1] *See* https://1touchpoint.com/services (last visited Aug. 24, 2022).
[2] *See* https://1touchpoint.com/notice-of-data-event (last visited Aug. 24, 2022).
[3] *See, e.g.,* https://oag.ca.gov/ecrime/databreach/reports/sb24-554203 (last visited Aug. 24, 2022).

Hackers obtained information from OTP including the personally identifiable information ("PII")[4] of thousands of individuals (including Plaintiffs), including, but not limited to, their names, addresses, ages, genders, member IDs, and health information that requires protection under HIPAA ("PHI") (collectively, "Private Information").[5]

3.     Defendant OTP, on its website, promises its consumers (like Plaintiffs and other individuals who are similarly situated) that:

> "To ensure that your Personally Identifiable Information receives an adequate level of protection, we have put in place appropriate procedures with the service providers we share your Personally Identifiable Information with to ensure that your Personally Identifiable Information is treated by those service providers in a way that is consistent with and which respects the applicable laws on data security and privacy."[6]

and that they "maintain commercially reasonable security measures to protect the Personally Identifiable Information we collect and store from loss, misuse, destruction, or unauthorized access."[7]

4.     Not only did hackers intentionally and purposefully steal the PII and PHI of Plaintiffs and Class members from Defendant, but, upon information and belief, these criminals have already used the Private Information to attempt to steal certain of Plaintiffs' and Class members' identities. Hackers accessed and then either used or offered for sale the unencrypted, unredacted, stolen PII and PHI to criminals. This stolen PII and PHI has great value to hackers.

5.     Because of Defendant's Data Breach, Plaintiffs' and Class members' PII and PHI is still available and may be for sale on the dark web for criminals to access and abuse for years

---

[4] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies a specific individual.
[5] *See* https://1touchpoint.com/notice-of-data-event (last visited Aug. 24, 2022).
[6] *See* https://1touchpoint.com/privacy-policy (last visited Aug. 24, 2022).
[7] *Id.*

into the future. Impacted consumers now face a lifetime risk of identity theft.

6.  Plaintiffs' and Class members' PII and PHI was compromised due to Defendant's negligent and/or careless acts and omissions and its failure to adequately protect the PII and PHI.

7.  Plaintiffs bring this action on behalf of all individuals (consumers) whose PII and PHI was compromised as a result of Defendant's failure to: (i) adequately protect consumers' PII and PHI, (ii) warn affected consumers of its inadequate information security practices, and (iii) effectively monitor its websites and platforms for security vulnerabilities and incidents. Defendant's conduct amounts to negligence and violates federal and state statutes.

8.  Plaintiffs and Class members have suffered injuries as a result of Defendant's conduct. These injuries include, but are not limited to: (i) lost or diminished inherent value of Private Information; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; and (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; and (iv) deprivation of rights they possess under state consumer protection statutes.

**PARTIES**

9.  Plaintiff Cynthia Saffo is a citizen of Georgia residing in Lithonia, Georgia. On or after August 12, 2022, she received a Notice of Data Breach Letter from Defendant, attached as Exhibit A.

10.  Plaintiff Tina Ingram and her minor child, H.I., are citizens of Ohio residing in Alliance, Ohio. On or after August 10, 2022, Plaintiff Ingram received Notice of Data Breach Letters on behalf of herself and her minor child from Defendant, attached as collective Exhibit B.

11.  Defendant OneTouchPoint, Inc. has its principal place of business at 1225 Walnut Ridge Drive, Harland, Wisconsin, 53029. OTP offers a multitude of brand enhancement services like printing and mailing services to over "3,000 customers, including Fortune 500 companies in

3

the manufacturing, franchise, retail, healthcare and financial services," according to its website.[8] OTP has 7 locations nationwide in – Arizona, California, Colorado, Minnesota, Texas, and Wisconsin. According to the records of the Wisconsin Secretary of State, OTP's registered agent is Corporation Service Company, which can be served at 8040 Excelsior Drive, Ste. 400, Madison, Wisconsin, 53717.[9]

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

13.     This Court has personal jurisdiction over Defendant because OneTouchPoint, Inc. has its principal place of business within this District.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in, were directed to, and/or emanated from this District. Defendant OTP resides within this judicial district and a substantial part of the events giving rise to the claims alleged herein occurred within this judicial district.

## FACTUAL ALLEGATIONS

### Background

15.     Defendant OTP is a third-party vendor providing health insurance carriers and healthcare providers mailing and printing services.[10]

16.     Defendant OTP, through its 7 offices, serves approximately 3,000 direct-customers (i.e., health insurance carriers and healthcare providers) nationwide.[11]

---

[8] *See* https://1touchpoint.com/services (last visited Aug. 24, 2022).
[9] *See* https://www.wdfi.org/apps/CorpSearch/Details.aspx?entityID=C046840&hash=15257132 25&searchFunctionID=1e75d5d0-f8b2-4e68-b8fd-c06acbd5a30e&type=Simple&q=ONE TOUCHPOINT (last visited Aug. 24, 2022).
[10] *See* https://1touchpoint.com/notice-of-data-event (last visited Aug. 24, 2022).
[11] *See* https://1touchpoint.com/services (last visited Aug. 24, 2022).

17.     Defendant OTP assures the healthcare industry that "outsourcing print production to the right partner [OTP] enables healthcare insurance providers to rest easy, knowing their customers' most sensitive information is safe and secure." and "when your healthcare insurance organization is ready to find a trusted, single-source marketing execution partner, we invite you to contact [OTP] to learn more or request a quote on your next project."[12]

18.     Defendant OTP assures healthcare providers that OTP "Ensure[s] compliance with state and federal regulations and execute HIPAA compliant patient communications with OneTouchPoint." And they emphasize that OTP "adhere[s] to the strictest HIPAA standards and ensure that the handling of protected health information (PHI) is secure."[13]

19.     In the ordinary course of doing business with Defendants, Defendants collect sensitive PII from consumers such as:

- Name;
- Address;
- Phone number;
- Email address;
- Health information; and
- Username and password.

20.     In the course of collecting Private Information from consumers, including Plaintiffs, Defendant promises to provide confidentiality and security for personal information, including by promulgating and placing privacy policies on its website.[14]

21.     Defendant OTP promises that it will protect consumers' privacy and remain in compliance with statutory privacy requirements. For example, Defendant OTP states on its website that it, OneTouchPoint Corp. "respects the privacy of your information . . . and safeguard[s] the

---

[12] *See* https://1touchpoint.com/blog/5-benefits-of-outsourced-printing-for-healthcare-insurance-providers (last visited Aug. 24, 2022).

[13] *See* https://1touchpoint.com/solutions/healthcare (last visited Aug. 24, 2022).

[14] *See* https://1touchpoint.com/privacy-policy (last visited Aug. 24, 2022).

information you provide to us in using our websites . . ., the services provided through our sites."[15]

22.     Defendant OTP acknowledges that "healthcare companies have to be laser focused on protecting their customers' privacy. Lapses in security that lead to individuals' protected health information (PHI) becoming public will not only anger a lot of customers, but they may also constitute HIPAA violations and land the organization in hot water," and "at OneTouchPoint, our solutions check each of these boxes… while maintaining airtight information security."[16]

23.     Defendant, however, failed to protect and safeguard Plaintiffs' and Class members Private Information. In fact, according to its Notice Letter, the cybercriminals were the ones to encrypt OTP's files, locking OTP out from accessing them.

### The Data Breach

24.     On or about July 27, 2022, Defendant OTP began notifying consumers and state Attorneys General about a data breach that occurred on or before April 27, 2022.

25.     According to its notice letters, OTP "launched an investigation, with the assistance of third-party forensic specialists, to determine the nature and scope of the activity."[17]

26.     The Notice of Data Breach letters claim that "Our investigation determined that there was unauthorized access to certain OTP servers beginning on April 27, 2022."[18]

27.     Defendant OTP "learned that we would be unable to determine what specific files the unauthorized actor viewed within the OTP network."[19]

28.     However, despite first learning of the Data Breach in April 2022, Defendant did not take any "measures" to notify affected Class Members for over three months, on or about July 27, 2022.

29.     According to the data breach report that Defendant filed with The Department of

---

[15] *Id.*
[16] *See* https://1touchpoint.com/blog/ensuring-patient-privacy-in-healthcare-communication (last visited Aug. 24, 2022).
[17] *See* https://1touchpoint.com/notice-of-data-event (last visited Aug. 24, 2022).
[18] *See id.*
[19] *See id.*

6

Health and Human Services Office of Civil Rights, the PII and PHI of approximately 1,073,316 individuals was accessed by unauthorized cybercriminals in the Data Breach.[20]

## Defendant Was Aware of the Risks of a Data Breach

30.    Defendant has clearly defined and mandatory obligations created by HIPAA, contract, industry standards, common law, and representations made to Plaintiffs and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

31.    Plaintiffs and Class members provided their Private Information to Defendant through third-party insurers and healthcare providers with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

32.    Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches in healthcare and information technology sector that services healthcare providers and insurers preceding the date of the breach.

33.    Data breaches, including those perpetrated against the healthcare and information technology sector of the economy, have become widespread. For example, the United States saw 1,244 data breaches in 2018 and had 446.5 million exposed records.[21]

34.    Defendant is well-aware of the risks associated with its business because OTP's website states:

- OneTouchPoint's end-to-end data security measures are HiTrust* certified
- Upload patient names and lists to a secure FTP site, while 100% match mailing ensures each patient receives the correct information.
- OTP's expertise encompasses secure strategies for print production
- OTP employees are trained annually on HIPAA requirements, and has the resources and knowledge to ensure HIPAA standards are met for physical, network, and

---

[20] *See* https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited Aug. 24, 2022).
[21] *See* https://www.varonis.com/blog/data-breach-statistics (last visited Aug. 24, 2022).

process security.[22]

35.     Data breaches, like the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so the at-risk entities can prepare for and ward off potential attacks. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known and completely foreseeable to the public and to anyone in Defendant's industry, including Defendant.

36.     According to the Federal Trade Commission ("FTC"), identity theft wreaks havoc on consumers' finances, credit history, and reputation and can take time, money, and patience to resolve.[23] Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank and finance fraud.[24]

37.     The Private Information of Plaintiffs and members of the Class was taken by hackers to engage in identity theft or and or to sell it to other criminals who will purchase the Private Information for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

38.     Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of the Plaintiffs and members of the Class, including their personally identifiable information, their health information, demographic information, and their insurance information, and knew of the foreseeable consequences that would occur if Defendant's data security systems were breached, including, specifically, the significant costs that would be

---

[22]*See*
https://d1xwurqb6vviqd.cloudfront.net/assets/Resources/Tools/OTP_Collateral_Overview_OneTouchPoint-for-Healthcare_v4.pdf (last visited Aug. 24, 2022).
[23] *See Taking Charge, What to Do If Your Identity is Stolen*, FTC, 3 (Apr. 2013), https://dss.mo.gov/cd/older-youth-program/files/taking-charge-what-to-do-if-identity-is-stolen.pdf (last visited Aug. 24, 2022).
[24] *Id*. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 CFR § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*.

imposed on Plaintiffs and members of the Class a result of a breach.

39.     Plaintiffs and members of the Class now face years of constant surveillance of their financial and personal records, lost time and monies spent on monitoring and protecting their accounts, and the loss of their property rights. The Class are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

40.     The injuries to Plaintiffs and members of the Class were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiffs and members of the Class.

## Defendant Fails to Comply with FTC Guidelines

41.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

42.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

43.     The FTC further recommends that companies not maintain Private Information (including both PII and PHI) longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

44.     The FTC has brought enforcement actions against businesses for failing to protect

consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

45.     Defendant failed to properly implement basic data security practices, including encryption and redaction of the stolen Private Information, and their failure to employ other reasonable and appropriate measures to protect against unauthorized access to consumer Private Information constitutes, among other things, an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

46.     Defendant was at all times fully aware of its obligation to protect the Private Information of consumers, prospective consumers, and employees. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### Defendant Fails to Comply with Industry Standards

47.     A number of industry and national best practices have been published and should have been used as a go-to resource and authoritative guide when developing Defendant's cybersecurity practices.

48.     Best cybersecurity practices that are standard in the information technology services industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

49.     Upon information and belief, Defendant failed to meet the minimum standards of the following cybersecurity frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8,

and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established standards in reasonable cybersecurity readiness.

50. These foregoing frameworks are existing and applicable industry standards in Defendant's industry, and Defendant failed to comply with these accepted standards, thereby opening the door to the Cyber-Attack and causing the Data Breach.

**Defendant's Conduct Violates HIPAA and Evidences Its Insufficient Data Security**

51. HIPAA requires covered entities to protect against reasonably anticipated threats to the security of sensitive patient health information.

52. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

53. Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq.* These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Defendant left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D); and 45 C.F.R. § 164.530(b).

54. Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate they failed to comply with safeguards mandated by HIPAA regulations.

55. Defendant's duty to protect patients' Private Information is neither a discretionary function nor discretionary duty under HIPAA.

**Defendant Fails to Protect Children's Private Information**

56. According to a 2021 study by Javelin Research and Strategy, child identity fraud affects one out of every 500 children annually, costs U.S. families nearly $1 billion annually, and

takes parents and guardians far longer to resolve than adult identity fraud.[25]

57.    According to this research, "One of the most daunting challenges, as it relates to detecting the theft or compromise of a child's identity, is that fraud typically takes place years after a child's personally identifiable information (PII) is initially breached." Because children are not filing taxes, applying for loans, and opening bank accounts, misuse of their Private Information is less often flagged early, and therefore can abused for much longer before detected.[26]

58.    A child's "blank slate" provides cyber criminals the opportunity to create a "synthetic" identity using both real and fictitious information to seek loans since a child's Social Security number completely lacks a credit history.[27]

59.    According to the FTC, cybercriminals armed with children's Social Security numbers, name, address, and date of birth are able to: apply for government benefits, like health care coverage or nutrition assistance; open a bank or credit card account; apply for a loan; sign up for a utility service, like water or electricity; or rent a place to live.[28]

60.    Although checking a child's credit report is a step that concerned parents should take, it is more difficult that checking an adult's credit report. A child's credit check may require requesting that each of the three reporting agencies perform a manual search and may require providing additional documentation, including but not limited to: the parent or legal guardian's driver's license or government-issued identification card; proof of the parent or legal guardian's address, (a utility bill, or a credit card or insurance statement); the child's birth certificate; and the child's Social Security card.[29] Each of these requirements can present hurdles—and are time-consuming—for parents who receive notice of a data breach affecting children.

---

[25] https://www.javelinstrategy.com/research/child-identity-fraud-web-deception-and-loss (last accessed Aug. 29, 2022).
[26] *Id.*
[27] *What is Child Identity Theft*?, Identity Theft Resource Center, https://www.idtheftcenter.org/help_center/what-you-need-to-know-about-child-identity-theft/ (last accessed Aug. 29, 2022).
[28] https://consumer.ftc.gov/articles/how-protect-your-child-identity-theft (last accessed Aug. 29, 2022).
[29] *Id.*

61.     Minor child patients are among the Class Members who received notice letters informing their parents that their children's Social Security numbers were stolen in OTP's Data Breach. OTP's failure to keep their Private Information secure is especially egregious and likely to result in decades of misuse.

## The Value of PII to Cyber Criminals

62.     Businesses that store personal information are likely to be targeted by cyber criminals. Credit card and bank account numbers are tempting targets for hackers; however, information such as full names, addresses, and dates of birth paired with other information like Social Security numbers is even more attractive to hackers. These forms of Private Information are not easily changed or destroyed and can be easily used to perpetrate identity theft and other types of fraud.

63.     The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200.[30]

64.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration ("SSA") stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause

---

[30] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs (last visited Aug. 24, 2022).

a lot of problems.[31]

65.    It is difficult to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

66.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[32]

67.    Furthermore, as the SSA warns:

Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

If you receive a new Social Security Number, you should not be able to use the old number anymore.

For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[33]

68.    Here, the unauthorized access left the cyber criminals with the tools to perform the most thorough identity theft—they have obtained all the essential Private Information to mimic

---

[31] SSA, *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Aug. 24, 2022).

[32] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last visited Aug. 24, 2022).

[33] SSA, *Identity Theft and Your Social Security Number*, SSA Publication No. 05-10064 (June 2018), http://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Aug. 24, 2022).

the identity of the user. The personal data of Plaintiffs and members of the Class stolen in the Data Breach constitutes a dream for hackers and a nightmare for Plaintiffs and the Class. Stolen personal data of the Plaintiffs and members of the Class represents essentially one-stop shopping for identity thieves.

69.     The FTC has released its updated publication on protecting Private Information for businesses, which includes instructions on protecting PII and PHI, properly disposing of PII and PHI, understanding network vulnerabilities, implementing policies to correct security problems, using intrusion detection programs, monitoring data traffic, and having in place a response plan.

70.     General policy reasons support such an approach. A person whose personal information has been compromised may not see any signs of identity theft for years. According to the United States Government Accountability Office ("GAO") Report to Congressional Requesters:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[34]

71.     Companies recognize that Private Information is a valuable asset, and Private Information is even considered a valuable commodity. A "cyber black-market" exists in which criminals openly post stolen Social Security numbers and other PII on a number of Internet websites. The stolen personal data of Plaintiffs and members of the Class has a high value on both legitimate and black markets.

72.     Identity thieves may commit various types of crimes such as immigration fraud, obtaining a driver's license or identification card in the victim's name but with another's picture, and/or using the victim's information to obtain a fraudulent tax refund or fraudulent unemployment benefits. The United States government and privacy experts acknowledge that it may take years for identity theft to come to light and be detected.

---

[34] *See* https://www.gao.gov/assets/gao-07-737.pdf at 29(June 2007) (last visited Aug. 24, 2022).

73.     As noted above, the disclosure of Social Security numbers in particular poses a significant risk. Criminals can, for example, use Social Security numbers along with other Private Information gained in a data breach to create false bank accounts or file fraudulent tax returns.

74.     The information lost in Defendant's Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, because retail victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—*i.e.,* names, dates of birth, Social Security numbers, phone numbers, addresses, and health information.

75.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[35]

**Plaintiffs' Experiences**

***Plaintiff Cynthia Saffo***

76.     Plaintiff Cynthia Saffo is and during all times relevant to this complaint, a resident of Lithonia (DeKalb County), Georgia.

77.     Soon after August 12, 2022, Plaintiff received the Notice of Data Breach from Defendant OTP, dated on that date. *See* Plaintiff's Notice Letter, attached as Exhibit A.

78.     The Notice Letter informed her that OTP experienced a data security incident that impacted certain systems and files containing personal information.

79.     According to the information provided in Defendant's website notice, the systems and files that were accessed without authorization "While the specific data elements vary for each potentially affected individual, the scope of information potentially involved includes an individual's name, member ID, and information that may have provided during a health

---

[35] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited July 11, 2022).

assessment."[36] However, on Plaintiff's Notice Letter (Ex. A), OTP states that it was "unable to determine what specific files the unauthorized actor viewed" and lists her name, address, and plan name as information that was present on the impacted OTP servers" and encrypted by the hackers. The files "were locked by the attacker and could not be opened" by OTP.

80. As a result of the Data Breach, Plaintiff Saffo has made efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach; reviewing her credit reports and financial account statements for any indications of actual or attempted identity theft or fraud.

81. Plaintiff Saffo now reviews her credit monitoring reports and/or checking account statements on a daily basis for fraud and other irregularities, in total spending approximately a half hour a week. This is valuable time Plaintiff Saffo otherwise would have spent on other activities, including but not limited to work and/or recreation.

82. Plaintiff Saffo is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

83. Plaintiff Saffo suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that OTP obtained from Plaintiff Saffo; (b) violation of her privacy rights; and (c) and being at risk of imminent and impending injury arising from identity theft and fraud.

84. Moreover, subsequent to the Data Breach, Plaintiff Saffo also experienced a significant increase in the amount of suspicious, unsolicited spam telephone calls. Each day, Plaintiff Saffo receives approximately 15-20 scam phone calls, each of which appear to be placed with the intent to obtain personal information to commit identity theft.

85. Plaintiff has already started suffering from identity theft. While reviewing one of her financial accounts after the breach, Plaintiff Saffo noticed that someone accessed her PayPal

---

[36]*See* https://1touchpoint.com/notice-of-data-event (last visited Aug. 24, 2022).

account and made an unauthorized $700.00 purchase.

86.     After the Data Breach, Plaintiff Saffo was notified by a credit monitoring service that her Private Information was found on the dark web.

87.     As a result of the Data Breach, Plaintiff Saffo anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Saffo will continue to be at increased risk of identity theft and fraud for years to come.

88.     Plaintiff Saffo has become anxious, nervous, and worried about this theft of her PII and has a continuing interest in ensuring that Defendant protects and safeguards her PII, which remains in its possession, from future breaches.

89.     Ms. Saffo is aware that cybercriminals often sell Private Information, and that her could be abused months or even years after Defendant's Data Breach.

90.     Upon information and belief, Plaintiff's Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach. Plaintiff Saffo was damaged in that her Private Information is now in the hands of cyber criminals.

### *Plaintiff Tina Ingram, individually and on behalf of her minor child, H.I.*

91.     Plaintiff Tina Ingram, and her minor child, H.I., are and during all times relevant to this complaint, a resident of Alliance (Stark County), Ohio.

92.     In mid-August 2022, Plaintiff received two Notices of Data Breach from Defendant OTP, dated August 12, 2022. One was sent to her regarding her own Private Information and the other was sent to her minor child, H.I., regarding the minor's Private Information *See* Plaintiff and Minor Child's Notice Letters, attached as collective Exhibit B.

93.     The Notice Letters informed Plaintiff Ingram that OTP experienced a data security incident that impacted certain systems and files containing personal information.

94.     According to the information provided in Defendant's website notice, the systems and files that were accessed without authorization "While the specific data elements vary for each potentially affected individual, the scope of information potentially involved includes an

individual's name, member ID, and information that may have provided during a health assessment."[37] However, each of the Ingrams' Notice Letters (collective Ex. B), lists their name, address, age, gender, Member ID, health condition, and plan name as information that was included in files that "were locked by the attacker and could not be opened" by OTP.

95.     As a result of the Data Breach, Plaintiff Ingram has made efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach; reviewing her credit reports and financial account statements for any indications of actual or attempted identity theft or fraud.

96.     Plaintiff Ingram now spends at least 10 minutes a day reviewing her financial account statements for fraud and other irregularities, but is unsure how to best protect her child's data. She is constantly concerned about whether fraudulent activities will appear on her accounts or using her minor child's information. This is valuable time Plaintiff Ingram otherwise would have spent on other activities, including but not limited to work and/or recreation.

97.     Plaintiff Ingram is very concerned about identity theft and fraud for both herself and her child, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

98.     Plaintiff Ingram and her minor child suffered actual injuries from having their Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her and her child's Private Information, a form of property that OTP obtained from both of them; (b) violation of their privacy rights; and (c) and being at risk of imminent and impending injury arising from identity theft and fraud.

99.     Moreover, subsequent to the Data Breach, Plaintiff Ingram also experienced a significant increase in the amount of suspicious, unsolicited spam text messages on the cellular phone number that she provided to her healthcare provider and insurance company for both herself and her child. Specifically, since OTP's Data Breach, Plaintiff Ingram has received spam text

---

[37]*See* https://1touchpoint.com/notice-of-data-event (last visited Aug. 24, 2022).

messages, including pornographic ones.

100.    As a result of the Data Breach, Plaintiff Ingram anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Ingram and her minor child will continue to be at increased risk of identity theft and fraud for years to come.

101.    Plaintiff Ingram has become anxious, nervous, and worried about this theft of her and her child's Private Information and has a continuing interest in ensuring that Defendant protects and safeguards their PII and PHI, which remains in Defendant's possession, from future breaches.

102.    Ms. Ingram is aware that cybercriminals often sell Private Information, and that hers and her child's Private Information could be abused months or even years after Defendant's Data Breach.

103.    Upon information and belief, Plaintiff and her child's Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach. Plaintiff Ingram and her minor child, H.I., were damaged in that their Private Information is now in the hands of cyber criminals.

**Plaintiffs' and Class Members' Damages**

104.    To date, Defendants have done virtually nothing to provide Plaintiffs and Class members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, reimbursements for costs and lost time Plaintiffs and Class members incurred because of the Data Breach.

105.    Defendant OTP understands the risks of this data breach and "encourages individuals to remain vigilant against incidents of identity theft and fraud" due to the breach. Yet Defendant OTP did not even offer any identity theft services to the victims of its Data Breach.[38] This is inadequate when victims are likely to face many years of identity theft, and their HIPAA-

---

[38] *See* Notice Letters, attached as Exhibits A and B.

covered PHI is no longer protected as it should have been by OTP as a business associate of healthcare providers and insurers.

106.     Defendant's failure to offer protection services is wholly inadequate. Defendant fails to compensate victims of the Data Breach, who commonly face multiple years of ongoing identity theft and loss of PHI. Defendant entirely fails to provide any compensation for its unauthorized release and disclosure of Plaintiffs' and Class members' Private Information.

107.     Moreover, Defendant OTP refuses to take any remedial action after causing harm to Plaintiffs and Class members by at least offering a credit or health information monitoring services. Instead, Plaintiffs and Class members are forced to spend extra time and money out of their own expense due to Defendant OTP's actions.

108.     Furthermore, by failing to offer an adequate credit monitoring service for Plaintiffs and Class members, the burden of Defendant's Data Breach falls on Plaintiffs and Class members, rather than on the Defendant. Plaintiff and Class members must investigate and protect themselves from Defendant's tortious acts resulting in the Data Breach. Defendant merely sent instructions to Plaintiffs and Class members about actions they can affirmatively take to protect themselves.

109.     Plaintiffs and Class members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

110.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

111.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been forced to expend time dealing with the effects of the Data Breach.

112.     Plaintiffs and Class members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Moreover, they face years of their PHI, private health information, being subject to mass public exposure.

113.    Plaintiffs and Class members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class members.

114.    Plaintiffs and Class members may also incur out-of-pocket costs for protective measures such as health information monitoring, credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

115.    Plaintiffs and Class members suffered a loss of value of their Private Information when it was intentionally acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

116.    Plaintiffs and Class members have spent and will continue to spend significant amounts of time to monitor their financial accounts and private health records for misuse.

117.    Plaintiffs and Class members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

    a.  Finding fraudulent charges;

    b.  Canceling and reissuing credit and debit cards;

    c.  Purchasing credit monitoring and identity theft prevention;

    d.  Addressing their inability to withdraw funds linked to compromised accounts;

    e.  Taking trips to banks and waiting in line to obtain funds held in limited accounts;

    f.  Placing "freezes" and "alerts" with credit reporting agencies;

    g.  Spending time on the phone with or at a financial institution to dispute fraudulent charges;

    h.  Contacting financial institutions and closing or modifying financial accounts; and

    i.  Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come; and

j. Reviewing their medical records and other sources for the unauthorized release of their private health information to the public.

118. Plaintiffs and Class members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information is not accessible online and that access to such data is password-protected.

119. Further, as a result of Defendant's conduct, Plaintiffs and Class members are forced to live with the anxiety that their Private Information—which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

120. As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and Class members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

121. Defendant's delay in identifying and reporting the Data Breach caused additional harm. It is axiomatic that "[t]he quicker a financial institution, credit card issuer, wireless carrier or other service provider is notified that fraud has occurred on an account, the sooner these organizations can act to limit the damage. Early notification can also help limit the liability of a victim in some cases, as well as allow more time for law enforcement to catch the fraudsters in the act."[39]

122. Indeed, once a Data Breach has occurred, "[o]ne thing that does matter is hearing about a Data Breach quickly. That alerts consumers to keep a tight watch on credit card bills and suspicious emails. It can prompt them to change passwords and freeze credit reports. And notifying officials can help them catch cybercriminals and warn other businesses of emerging dangers. If

---

[39] *Identity Fraud Hits Record High with 15.4 Million U.S. Victims in 2016, Up 16 Percent According to New Javelin Strategy & Research Study*, Business Wire, https://www.businesswire.com/news/home/20170201005166/en/Identity-Fraud-Hits-Record-High-15.4-Million (last visited Aug. 24, 2022).

consumers don't know about a breach because it wasn't reported, they can't take action to protect themselves" (internal citations omitted).[40]

123.     Although their Private Information was improperly exposed in February of 2022, the affected individuals, upon information and belief and based on the experience of Plaintiffs, were not notified of the Data Breach until June 9, 2022 or later depriving them of the ability to promptly mitigate potential adverse consequences resulting from the Data Breach.

124.     As a result of Defendant's delay in detecting and notifying consumers of the Data Breach, the risk of fraud for Plaintiffs and Class has been driven even higher.

## CLASS ALLEGATIONS

125.     Plaintiffs bring this nationwide class action pursuant to Rules 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following class:

> All natural persons residing in the United States whose Private Information was compromised in the Data Breach that was announced by Defendant(s) on or about July 27, 2022 (the "Class").

126.     Excluded from the Class are all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out, and all judges assigned to hear any aspect of this litigation and their immediate family members.

127.     Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

128.     **Numerosity**: The Class is so numerous that joinder of all members is impracticable. Defendants have identified approximately 1,073,316 individuals whose PII was improperly accessed in the Data Breach, and the large majority of Class members are apparently identifiable within Defendant's records based upon the Notice Letters Defendant sent.

---

[40] Consumer Reports, *The Ransomware Attack Next Door Security breaches don't just hit giants like Equifax and Marriott. Breaches at small companies put consumers at risk, too* (Jan. 31, 2019), https://www.consumerreports.org/data-theft/the-data-breach-next-door/ (last visited Aug. 24, 2022).

129. **Commonality**: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual members of the Class. These include:

   a. When Defendant actually learned of the Data Breach and whether their response was adequate;

   b. Whether Defendant owed a duty to the Class to exercise due care in collecting, storing, safeguarding and/or obtaining their PII;

   c. Whether Defendant breached that duty;

   d. Whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of storing the PII of Plaintiffs and members of the Class;

   e. Whether Defendant acted negligently in connection with the monitoring and/or protection of PII belonging to Plaintiffs and members of the Class;

   f. Whether Defendant knew or should have known that they did not employ reasonable measures to keep the PII of Plaintiffs and members of the Class secure and to prevent loss or misuse of that PII;

   g. Whether Defendant have adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

   h. Whether Defendant caused Plaintiffs and members of the Class damage;

   i. Whether Defendant violated the law by failing to promptly notify Plaintiffs and members of the Class that their PII had been compromised;

   j. Whether Defendant violated common law and statutes invoked below; and

   k. Whether Plaintiffs and the other members of the Class are entitled to extended credit monitoring and other monetary relief.

130. **Typicality**: Plaintiffs' claims are typical of those of the other members of the Class because all had their PII compromised as a result of the Data Breach due to Defendant's misfeasance.

131. **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests

of the members of the Class. Plaintiffs' Counsel are competent and experienced in litigating privacy-related class actions.

132. **Superiority and Manageability**: Under Rule 23(b)(3) of the Federal Rules of Civil Procedure, a class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Individual damages for any individual member of the Class are likely to be insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Defendant's misconduct would go unpunished. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

133. Class certification is also appropriate under Rule 23(a) and (b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Nationwide Class as a whole and as to the Subclass as a whole.

134. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a. Whether Defendant owed a legal duty to Plaintiffs and members of the Class to exercise due care in collecting, storing, using, and safeguarding their PII;

    b. Whether Defendant breached a legal duty to Plaintiffs and the members of the Class to exercise due care in collecting, storing, using, and safeguarding their PII;

    c. Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

    d. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

e.  Whether members of the Class are entitled to actual damages, credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendant's wrongful conduct.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF
**Negligence**
**(On Behalf of Plaintiffs and All Class Members)**

135.  Plaintiffs re-allege and incorporate by reference the above allegations.

136.  Defendant owed a duty to Plaintiffs and Class members to exercise reasonable care in obtaining, using, and protecting their PII and PHI from unauthorized third parties.

137.  The legal duties owed by Defendant to Plaintiffs and Class members include, but are not limited to the following:

a.  To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII and PHI of Plaintiffs and Class members in its possession;

b.  To protect PII and PHI of Plaintiffs and Class members in its possession using reasonable and adequate security procedures that are compliant with industry-standard practices; and

c.  To implement processes to quickly detect a data breach and to timely act on warnings about data breaches, including promptly notifying Plaintiffs and Class members of the Data Breach.

138.  Defendant's duty to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a) (the "FTC Act"), which prohibits "unfair . . . practices in or affecting commerce," including, as interested and enforced by the Federal Trade Commission, the unfair practices by companies such as Defendants of failing to use reasonable measures to protect PII.

139.     Various FTC publications and data security breach orders further form the basis of Defendant's duty. Plaintiffs and Class members are consumers under the FTC Act. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and by not complying with industry standards.

140.     Defendant breached its duties to Plaintiffs and Class members. Defendant knew or should have known the risks of collecting and storing PII and PHI and the importance of maintaining secure systems, especially in light of the fact that data breaches have been surging since 2016.

141.     Defendant knew or should have known that its security practices did not adequately safeguard Plaintiffs' and the other Class members' PII and PHI.

142.     Through Defendant's acts and omissions described in this Complaint, including Defendant's failure to provide adequate security and its failure to protect the Private Information of Plaintiffs and the Class from being foreseeably captured, accessed, exfiltrated, stolen, disclosed, and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure Plaintiffs' and Class members' PII during the period it was within Defendant's possession and control.

143.     Defendant breached the duties they owe to Plaintiffs and Class members in several ways, including:

a. Failing to implement adequate security systems, protocols, and practices sufficient to protect employees' and customers' PII and PHI and thereby creating a foreseeable risk of harm;

b. Failing to comply with the minimum industry data security standards during the period of the Data Breach;

c. Failing to act despite knowing or having reason to know that their systems were vulnerable to attack; and

d. Failing to timely and accurately disclose to customers and employees that their PII had been improperly acquired or accessed and was potentially available for sale to criminals on the dark web.

144. Due to Defendant's conduct, Plaintiffs and Class members are entitled to extended credit monitoring. Credit monitoring for at least 10 years is reasonable here. The PII and PHI taken can be used for identity theft and other types of financial fraud against the Class members.

145. Some experts recommend that data breach victims obtain credit monitoring services for at least ten years following a data breach.[41] Annual subscriptions for credit monitoring plans range from approximately $219 to $358 per year.

146. As a result of Defendant's negligence, Plaintiffs and Class members suffered injuries that may include: (i) the lost or diminished value of Private Information; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including, but not limited to, time spent deleting phishing email messages and cancelling credit cards believed to be associated with the compromised account; (iv) the continued risk to their Private Information, which may remain for sale on the dark web and is in Defendant's possession and subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII and PHI in its continued possession; (v) future costs in terms of time, effort, and money that will be expended to prevent, monitor, detect, contest, and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class members, including ongoing credit monitoring.

---

[41] In the recent Equifax data breach, for example, Equifax agreed to free monitoring of victims' credit reports at all three major credit bureaus for four years, plus $1 million of identity theft insurance. For an additional six years, victims can opt for free monitoring by one credit bureau, Equifax. In addition, if a victim's child was a minor in May 2017, he or she is eligible for a total of 18 years of free credit monitoring under the same terms as for adults.

147. These injuries were reasonably foreseeable given the history of security breaches of this nature. The injury and harm that Plaintiffs and the other Class members suffered was the direct and proximate result of Defendant's negligent conduct.

148. Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

149. Defendant's duty of care to use reasonable security measures arose due to the special relationship that existed between it and the Class, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class members from a cyberattack and data breach.

150. HIPAA imposes a duty and an actionable standard of care for an ordinary negligence claim. The HIPAA Privacy Rule prohibits covered entities from using or disclosing personal health information except as permitted by regulation. 45 C.F.R. § 164.502(a). The HIPAA privacy restrictions also govern the business associates of covered entities. 45 C.F.R. § 160.102. OTP is subject to the actionable standards of care established by HIPAA as a business associate of covered entities.

151. Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

152. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . .

practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

153.  Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant was bound by industry standards to protect confidential Private Information.

154.  Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class members' Private Information. The specific negligent acts and omissions committed by Defendant includes, but is not limited to, the following:

   a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class members' Private Information;

   b.  Failing to adequately monitor the security of its networks and systems;

   c.  Failure to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

   d.  Allowing unauthorized access to Class members' Private Information;

   e.  Failing to detect in a timely manner that Class members' Private Information had been compromised; and

   f.  Failing to timely notify Class members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

155.  It was foreseeable that Defendant's failure to use reasonable measures to protect Class members' Private Information would result in injury to Class members. The breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in both the financial services and medical industry.

156.  The Data Breach was foreseeable due to Defendant's to adequately safeguard Class members' Private Information and was foreseeable that it would result in one or more types of injuries to Class members.

157.  Plaintiffs and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

31

158.     Plaintiffs and Class members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class members.

**SECOND CLAIM FOR RELIEF**
**Negligence *Per Se***
**(On Behalf of Plaintiffs and All Class Members)**

159.     Plaintiffs re-allege and incorporate by reference the above allegations.

160.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant's, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

161.     Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of the Data Breach for companies of Defendant's magnitude, including, specifically, the immense damages that would result to Plaintiffs and members of the Class due to the valuable nature of the PII at issue in this case.

162.     Defendant's violations of Section 5 of the FTC Act constitute negligence *per se*.

163.     Plaintiffs and members of the Class are within the class of persons that the FTC Act was intended to protect.

164.     The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

165.     As a direct and proximate result of Defendant's negligence per se, Plaintiffs and members of the Class have suffered and will suffer injury, including but not limited to: (i) actual

identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information of consumers in its continued possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and members of the Class.

166.    Additionally, as a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and members of the Class have suffered and will suffer the continued risks of exposure of their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in their continued possession.

167.    Pursuant to the HIPAA (42 U.S.C. § 1302d, *et seq.*) and the FTCA, OTP was required by law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiffs' and Class members' Private Information.

168.    OTP breached its duties by failing to employ industry standard data and cybersecurity measures to gain compliance with those laws, including, but not limited to, proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

169.    It was reasonably foreseeable, particularly given the growing number of data breaches of health information, that the failure to reasonably protect and secure Plaintiffs' and

Class members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to OTP's networks, databases, and computers that stored or contained Plaintiffs' and Class members' Private Information.

170. Plaintiffs' and Class members' Private Information constitutes personal property that was stolen due to OTP's negligence, resulting in harm, injury and damages to Plaintiffs and Class members.

171. OTP's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiffs' and Class members' unencrypted Private Information.

172. Plaintiffs and Class members have suffered and will continue to suffer damages as a result of OTP's conduct. Plaintiffs and Class members seek damages and other relief as a result of OTP's negligence.

<u>THIRD CLAIM FOR RELIEF</u>
**Invasion of Privacy**
**(On Behalf of Plaintiffs and All Class Members)**

173. Plaintiffs reallege and incorporate by reference of the above allegations.

174. Plaintiffs and Class members maintain a privacy interest in their Private Information, confidential information that is also protected from disclosure by applicable laws set forth above. Plaintiffs and Class Members' Private Information was contained, stored, and managed electronically in Defendant's records, computers, and databases that was intended to be secured from unauthorized access to third-parties because it contained highly sensitive, confidential matters regarding Plaintiffs' and Class members' identities, unique identification numbers, medical histories, and financial records that were only shared with Defendant for the limited purpose of obtaining and paying for healthcare, medical goods and services, or alternatively, exchanged labor or products for pay from Defendant. Additionally, Plaintiffs' and Class members' Private Information, when contained unencrypted and in electronic form, is highly

attractive to criminals who can nefariously use their Personal Information for fraud, identity theft, and other crimes without their knowledge and consent.

175.   OTP's disclosure of Plaintiffs' and Class members' Private Information to unauthorized third parties as a result of its failure to adequately secure and safeguard their Personal Information is offensive to a reasonable person.

176.   OTP's disclosure of Plaintiffs' and Class members' Private Information to unauthorized third parties permitted the physical and electronic intrusion into Plaintiffs' and Class members' personal quarters where their Private Information was stored and disclosed private facts about their health and finances into the public domain.

177.   Plaintiffs and Class members have been damaged by OTP's conduct, including by paying for data and cybersecurity protection that they did not receive, as well as by incurring the harms and injuries arising from the Data Breach now and in the future.

<u>FOURTH CLAIM FOR RELIEF</u>
**Unjust Enrichment**
**(On Behalf of Plaintiffs and All Class Members)**

178.   Plaintiffs reallege and incorporate by reference of the above allegations. Plaintiffs and Class members conferred a benefit on OTP by paying for data and cybersecurity procedures to protect their Private Information that they did not receive.

179.   OTP has retained the benefits of its unlawful conduct including the amounts received for data and cybersecurity practices that it did not provide. Due to OTP's conduct alleged herein, it would be unjust and inequitable under the circumstances for OTP to be permitted to retain the benefit of its wrongful conduct.

180.   Plaintiffs and the Class members are entitled to full refunds, restitution and/or damages from OTP and/or an order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by OTP from its wrongful conduct. If necessary, the establishment of a constructive trust from which the Plaintiffs and Class members may seek restitution or compensation may be created.

181.     Additionally, Plaintiffs and the Class members may not have an adequate remedy at law against OTP, and accordingly plead this claim for unjust enrichment in addition to or, in the alternative to, other claims pleaded herein.

**FIFTH CLAIM FOR RELIEF**
**Breach of Confidentiality of Health Records, Wis. Stat. 146.81,** *et seq.*
**(On behalf of Plaintiffs and All Class Members)**

182.     Plaintiffs reallege and incorporate by reference the above allegations.

183.     The Wis. Stat. §§ 146.81, *et seq.*, provides in pertinent part: "All patient health care records shall remain confidential. Patient health care records may be released only to the persons designated in this section or to other persons with the informed consent of the patient or of a person authorized by the patient." Wis. Stat. § 146.82(1).

184.     Plaintiffs and Class members stolen Private Information is defined as "patient healthcare records" by Wis. Stat. § 146.81(4).[42]

185.     Defendant OTP is considered a "business associate" or "covered entity" under Wis. Stat. § 146.816(1)(a-b)[43]

186.     Under Wis. Stat § 146.84(1)(b) "Any person . . . who violates [this statute] in a manner that is knowing and willful shall be liable to any person injured as a result of the violation," and is liable for "actual damages to that person, exemplary damages of not more than $25,000 and costs and reasonable attorneys' fees."

187.     This statute provides that "Any person . . . who negligently violates [this statute] shall be liable to any person injured as a result of the violation" and is liable for "actual damages of not more than $1,000 and cost and reasonable attorneys' fees." Wis. Stat. § 146.84(1)(b)(m)

188.     Furthermore, Wis. Stat. § 146.84(1)(c) provides that "an individual may bring an action to enjoin any violation of §§ 146.82 or 146.83 or to compel compliance with §§ 146.82 or 146.83" and the individual "may, in the same action, seek damages as provided in this subsection."

---

[42] Wis. Stat. Ann. § 146.81 (West).
[43] *Id.*

189.     Defendant OTP violated Wis Stat. §§ 146.81, *et seq.* when it failed to protect and disclosed patient health care records and Private Information to unauthorized third parties without the informed consent of Plaintiffs and Class members. Defendant OTP did not have express and/or implied consent to disclose or give access to Plaintiffs' and Class members' Private Information to cybercriminals. To this day, Defendant still lacks express and/or implied consent to do so. Defendant understood their duty and obligation to Plaintiffs and Class members and expressly assured the safety of their Private Information and patient healthcare records.

190.     Defendant failed to caution the public and Plaintiffs and Class members, directly or through its third-party customers, that their Private Information could be given or stolen by unauthorized third parties as a result of Defendant's computer systems and software being inadequate, easily accessible by unknown actors, and unprotected from foreseeable cyberattacks.

191.     Plaintiffs and Class members had no reason to be on notice, under belief, or suspect that Defendant's computer systems and software were so inadequate, easily accessible by unknown actors, and so unprotected from foreseeable cyberattacks that it would avail their Private Information and healthcare records to unauthorized third parties.

192.     To the contrary, OTP makes public statements about the nature of its business model and on its privacy policy, stating expressly:

> "[OTP] maintain[s] commercially reasonable security measures to protect the Personally Identifiable Information [OTP] collect[s] and store from loss, misuse, destruction, or unauthorized access."[44]

193.     Plaintiffs and Class members need not have actual damages as a prerequisite for OTP to have liability for statutory or exemplary damages under Wis. Stat. § 146.81.

194.     Moreover, other Wisconsin statues (*e.g.*, Wis. Stat. § 134.97(3)(a) and (b), "Civil Liability; Disposal and Use" of records containing personal information), proves the Wisconsin

---

[44] https://1touchpoint.com/privacy-policy.

legislature intended to refrain from including an actual damages requirement in Wis. Stat. § 146.84 due to the lack of ambiguity when making such a requirement in other privacy statutes.[45]

195.    The Wisconsin legislature made it apparent that the exemplary damages referred to Wis. Stat. § 146.81 are not the same as punitive damages.

196.    The plain language of Wis. Stat. § 895.043(2), "Scope" of punitive damages, maintains an award of "exemplary damages" under Wis. Stat. §§ 146.84(1)(b) and (bm) does not apply to or is excluded from the scope of "punitive damages" available under Section 895.043.

197.    Exemplary damages under Wis. Stat. § 146.84(1)(b) and (bm) differ from actual damages and punitive damages; thus, statutory damages are available to persons who have been "injured as a result of the [data breach]" such as the one that occurred in April of 2022 by OTP.[46]

198.    Plaintiffs and Class members request that the Court issue declaratory relief declaring Defendant's practice of using computer systems and software which are inadequate, easily accessible by unknown actors, and unprotected from foreseeable cyberattacks unlawful. OTP's current practice makes them easy targets for cybercriminals to hack for storage and communication of Private Information data between Defendant and third parties. The Plaintiffs and Class members further request the Court enter an injunction requiring Defendant to cease the unlawful practices described herein, and enjoining Defendant from disclosing or using Private Information without first adequately securing or encrypting it.

199.    Plaintiffs and Class members request the Court order Defendant to identify, seek, obtain, encrypt, and all existing Private Information, whether in its possession or the possession of third parties and provide it to the Plaintiffs and Class members.

200.    Plaintiffs and Class members request that the Court enter an injunction ordering Defendant to:

---

[45] *See* Wis. Stat. § 134.97(3)(a) and (b) (West).
[46] *See* Wis. Stat. § 146.84(1)(b) and (bm) (West).

a. identify to each Class member in writing with reasonable specificity the Private Information of each such Class member that was stolen in the Data Breach, including without limitation as required under Wis. Stat. § 134.98(3)(c);

b. meaningfully educate consumers about their privacy rights by, without limitation, written statements describing with reasonable specificity the precautionary steps Defendant is taking to update its security technology to adequately secure and safeguard consumer Private Information;

c. engage a third-party ombudsman as well as internal compliance personnel to monitor, conduct test, and audit Defendant's safeguards and procedures on a periodic basis;

d. conduct regular verifications of its safeguards and procedures; and

e. audit, test, and train personnel regarding safeguards and procedures, including educating personnel how to immediately identify violations when they occur and what to do in response.

201. Plaintiffs and Class members request the Court enter an Order pursuant to Wis. Stat. § 146.84(1)(bm) awarding minimum statutory exemplary damages of $1,000 to Plaintiffs and each Class Member whose Private Information was compromised and stolen, as well as attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class members, request judgment against the Defendant and that the Court grant the following:

a. An order certifying the Class as defined herein, and appointing Plaintiffs and their counsel to represent the Class;

b. An order enjoining Defendant from engaging in the wrongful conduct alleged herein concerning disclosure and inadequate protection of the PII and PHI belonging to Plaintiffs and the members of the Class;

c. Injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class members, including but not limited to an order:

    i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiffs and Class members;

    iv. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class members;

    v. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's computer network, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

    vi. requiring Defendant to audit, test, and train their security personnel regarding any new or modified procedures;

    vii. requiring Defendant to segment data by, among other things, creating firewalls and access controls to isolate access in case of a future data

breach;

    viii.   requiring that Defendant establish an information security training program that includes information security training for its employees;

    ix.   requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

    x.   requiring Defendant to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

d.   An award of compensatory, statutory, exemplary, nominal and punitive damages, in an amount to be determined at trial;

e.   An award for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

f.   An award of reasonable attorneys' fees, costs, and litigation expenses, as allowable by law; and

g.   Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand that this matter be tried before a jury.

Dated: August 29, 2022                                Respectfully Submitted,

/s/ Lisa A. White
By: Lisa A. White, TN Bar # 026658
Admitted to the ED of Wisconsin

Gary E. Mason (admission pending)
Danielle L. Perry (admission pending)
**MASON LLP**
5101 Wisconsin Avenue NW, Suite 305
Washington, D.C. 20016
Phone: 202-429-2290
Fax: 202-429-2294
*lwhite@masonllp.com*
*gmason@masonllp.com*
*dperry@masonllp.com*

*Attorneys for Plaintiffs and the Class*